NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190097-U

NO. 4-19-0097

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 19, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| WESLEY R. CAREY, | ) | No. 16CF61 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding (1) the State proved defendant guilty of first degree murder beyond a reasonable doubt, (2) the trial court did not abuse its discretion when it admitted other-crimes evidence and rebuttal testimony, (3) the court properly denied defendant's motion to suppress and appropriately admitted a nonredacted recording of defendant's police interrogation at trial, (4) the court did not abuse its discretion when it allowed testimony regarding the lyrics and content of the song "Dance with the Devil," and (5) the court did not err in imposing a 45-year sentence.

¶ 2    Following a fall 2018 trial, a jury found defendant, Wesley R. Carey, guilty of

first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)).  In February 2019, the trial court

sentenced defendant to 45 years' imprisonment.

¶ 3    Defendant appeals, arguing (1) the State failed to prove him guilty beyond a

reasonable doubt; (2) the trial court abused its discretion when it admitted prejudicial

other-crimes evidence and improper rebuttal testimony; (3) the court erred when it denied

defendant's motion to suppress and admitted into evidence at trial a recording of defendant's police interrogation where police failed to scrupulously honor defendant's right to remain silent and, in the alternative, the court should have redacted portions of defendant's recorded interrogation where defendant made statements that represented the opinion of a police officer; (4) the court abused its discretion when it admitted testimony as to the lyrics and content of the song "Dance with the Devil"; and (5) the court abused its discretion in sentencing defendant to 45 years in prison where the court failed to consider the uncontradicted evidence of defendant's rehabilitative potential. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        In January 2016, the State charged defendant with three counts of first degree murder alleging he stabbed Nicole Maxey with a knife, resulting in her death (720 ILCS 5/9-1(a)(1) (West 2014)) (count I and count II); (720 ILCS 5/9-1(a)(2) (West 2014)) (count III).

¶ 6                              A. Pretrial Motions

¶ 7        In January 2017, defendant filed a notice informing the State of his intent to assert the affirmative defense of self-defense. Defendant also filed a motion *in limine* asking to present, at trial, evidence of the alleged victim's propensity for violence pursuant to *People v. Lynch*, 104 Ill. 2d 194, 199-200, 470 N.E.2d 1018, 1020 (1984), where Maxey "previously stabbed a man with a knife" and had a "history of directing violence against men."

¶ 8        In April 2018, defendant filed a motion *in limine* asking to exclude or redact the content of defendant's recorded custodial interrogation on the basis of relevance. Specifically, defendant argued his statements during his police interrogation were based on what Officer Eric Bertoni told him happened to Maxey.

¶ 9　　　　　At an August 2018 hearing, the trial court heard evidence from defendant and Keith Allen Underwood, Maxey's ex-boyfriend, about a September 2009 incident where Maxey stabbed Underwood.  Defendant stated Maxey previously told him about the 2009 incident.  The court found Maxey's propensity for violence relevant and stated, "If [defendant] testifies and there's evidence of self-defense, the statements that [Maxey] made to [defendant] acknowledge—informing him that she had stabbed somebody is going to come in through his testimony subject to Mr. Underwood also then testifying to the total context."  Next, the court denied defendant's motion to exclude or redact the contents of defendant's recorded custodial interrogation.  Relying on *People v. Whitfield*, 2018 IL App (4th) 150948, 103 N.E.3d 1096, the court found the officers' statements during defendant's interrogation were relevant.

¶ 10　　　　　In September 2018, defendant filed a second motion *in limine* seeking to present evidence of the alleged victim's propensity for violence pursuant to *Lynch*, where Maxey had a 2003 conviction for domestic battery which arose from an incident with her then-stepfather, Gordon A. Lynn.  Defendant also filed an omnibus motion *in limine* asking to exclude, in relevant part, (1) the lyrics or any reference to the song "Dance with the Devil" and (2) evidence of a New Year's Eve 2015 incident where defendant broke the front window of Maxey's apartment.  Defendant filed a motion to suppress statements unlawfully elicited during defendant's custodial interrogation.  In the motion to suppress, defendant argued that "[b]ecause [d]efendant invoked his right to remain silent, and law enforcement failed to scrupulously honor defendant's unequivocal invocation of that right, any and all subsequent statements elicited are inadmissible as a matter of law."

¶ 11　　　　　At a September 2018 hearing, the trial court heard evidence from Lynn regarding the 2003 incident that resulted in Maxey's conviction for domestic battery.  The court granted

defendant's motion to present evidence of Maxey's propensity for violence, stating, "with the proper foundation laid, then I would permit it, permit him to be called for—to provide that testimony[.]"

¶ 12    At an October 5, 2018, hearing on defendant's motion to suppress, the trial court heard evidence from multiple witnesses. Officer Bertoni with the Pawnee Police Department testified that on January 18, 2016, around 9 p.m., he responded to a residence for a stabbing. Officer Bertoni testified both Maxey and defendant were transported to St. John's Hospital where Officer Bertoni eventually spoke with defendant. Around 4:30 a.m., defendant woke up in the hospital and asked Officer Bertoni what happened. Before answering, Officer Bertoni read defendant his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant acknowledged he understood his rights and again asked what happened. Officer Bertoni indicated defendant stabbed Maxey. Subsequently, defendant "covered his head up and said he didn't want to talk anymore because he was ashamed of what he did." Officer Bertoni testified he did not continue questioning defendant.

¶ 13    A while later, Officer Bertoni received a telephone call and stepped out of defendant's hospital room. When Officer Bertoni stepped back into defendant's hospital room, defendant asked him what happened. Officer Bertoni advised defendant that Maxey died. Defendant then started "yelling and trying to choke himself." Once the hospital discharged defendant, Officer Bertoni transported defendant to the Sangamon County Sheriff's Office to be interviewed.

¶ 14    Detective Mike McMasters with the Sangamon County Sheriff's Department testified that on January 19, 2016, around 12:30 p.m., he interviewed defendant at the Sangamon County Sheriff's Office. Before questioning defendant, Detective McMasters read defendant his

- 4 -

*Miranda* rights. Defendant agreed to speak with Detective McMasters and the interview commenced.

¶ 15    Defendant testified that when he woke up in the hospital, he asked Officer Bertoni what happened. Officer Bertoni indicated defendant stabbed Maxey. Defendant then stated he told Officer Bertoni he did not want to talk anymore. Defendant testified his conversation with Officer Bertoni briefly ceased "for about five or six minutes." Then, Officer Bertoni asked defendant several questions while "filling out [his] report." Defendant testified "[t]hen it kind of got a little more in-depth after that." Defendant told Officer Bertoni he did not remember fighting or arguing with Maxey and he did not want to talk with Officer Bertoni any longer.

¶ 16    About 20 minutes later, Officer Bertoni received a telephone call and left defendant's hospital room. Officer Bertoni then came back into the room and told defendant Maxey died and that defendant was being charged with first degree murder. Defendant testified Officer Bertoni then again asked him about the incident and what transpired.

¶ 17    When Officer Bertoni transported defendant to the Sangamon County jail, defendant told Officer Bertoni that he did not want to be interviewed. Officer Bertoni told defendant to "just go in there and tell them the truth[.]"

¶ 18    Subsequently, the trial court denied defendant's motion to suppress. The court found,

> "more credible [Officer Bertoni] who is having trouble
> remembering specifics about the particular circumstances that
> occurred over two and a half years ago who had not reviewed the
> transcript, who had not reviewed the circumstances much more
> credible than a defendant coming to from being in that

circumstance who remembers absolutely verbatim word for word exactly the conversation he had."

Further, the court stated,

"So, based on everything that is before the [c]ourt here today, the factors the [c]ourt is to consider, the [c]ourt does find by a preponderance of the evidence that the police at that time during the second interview scrupulously honored the [d]efendant's invocation of his right to silence. He voluntarily waived that right at that time. And the contents of the statement provided will be admissible subject to any further motions that the [c]ourt has to address going forward."

¶ 19 At an October 23, 2018, hearing, the trial court ruled on defendant's omnibus motion *in limine* to exclude, in relevant part, (1) the lyrics or any reference to the song "Dance with the Devil" and (2) evidence of a New Year's Eve 2015 incident where defendant broke the front window of Maxey's apartment. The court denied the motion *in limine* regarding both the song lyrics and the New Year's Eve window-breaking incident. As to the window-breaking incident, the court found the incident "highly relevant" where defendant "in his own words referred to the particular conduct and compared it to the events of this fateful evening." As to the song, the court stated,

"The [d]efendant's state of mind is going to be an extremely contested issue in this case. And his attraction to that song and his knowledge of the contents of the lyrics, the meaning behind the song is overwhelming relevant to his state of mind, and a jury

- 6 -

should be able to hear the impact this song has on him and how it impacted everything that unfolded that evening.

In the end, while it might be inflammatory and somewhat suggestive, it is in no way more prejudicial than it is probative."

¶ 20                    B. Defendant's Jury Trial

¶ 21        Below, we summarize the relevant testimony elicited during defendant's jury trial, held over three consecutive days in October and November 2018.

¶ 22                         1. *Defendant*

¶ 23        Defendant testified that on January 18, 2016, around 2:30 p.m. he and Maxey, his girlfriend, started drinking at Maxey's apartment in Pawnee, Illinois. Defendant and Maxey drank a bottle of Canadian Superior whiskey and listened to music. Subsequently, Maxey received a telephone call from her ex-boyfriend. Defendant testified that after Maxey finished her phone call, he played the song "Dance with the Devil" by Immortal Technique on YouTube. Defendant described himself as being quite drunk due to drinking for about an hour. Defendant and Maxey discussed the lyrics of the song. Defendant testified the song affected Maxey emotionally and "[s]he got upset."

¶ 24        About 30 minutes later, defendant took a nap. After a couple of hours, Maxey woke defendant up, poured him a drink, and asked to have sex with defendant. Defendant testified, "I told her that I was sick and I was tired and I just wanted to go back to bed." In response, Maxey "got really upset and she started going crazy." Defendant testified he told Maxey, "this is not working. I said this just isn't going to work." Maxey punched defendant in the face and kept hitting him. Defendant testified he pushed Maxey but did not recall if he threw a punch or not while attempting to get her off. Defendant then grabbed Maxey's cellular

telephone and threatened to call the police. Defendant testified he walked toward the door to dial 911, when Maxey "grabbed me around the neck like this and she's trying to get to the phone and she pulled backwards and we slipped. We fell clean backwards and fell hard, real hard, on her back. And I fell kind of on top of her and kind of beside her. But she just hooked me around the neck. We fell back. And she smashed—we smashed the chair to blitherines [*sic*]. We landed on the kiddie chair. We smashed the chair. It flew into the living room. We're on the floor, and she—we're fighting over the phone." Maxey eventually grabbed her cellular telephone from defendant and went out the front door of her apartment.

¶ 25        Defendant went to collect his belongings and leave the apartment, when about a minute and a half later, Maxey returned to the apartment. Defendant walked into the kitchen and observed Maxey holding a steak knife in her hand. Maxey then moved toward defendant with the knife in her hand. Defendant grabbed her wrist in an attempt to pull the knife out of her hand. Defendant and Maxey struggled with the knife as they fell to the ground. During the fall, defendant wrestled control of the knife from Maxey. Defendant then tossed the knife over the back of their heads. Defendant testified Maxey tried to reach for the knife but she was bleeding all over the place. Specifically, blood squirted out of her arm all over defendant. At that point, Maxey's one-year-old son walked into the room.

¶ 26        Defendant testified that a week before the January 18 incident, Maxey told defendant she previously stabbed her ex-boyfriend, Underwood. During the struggle on January 18, defendant recalled the story where Maxey previously stabbed her ex-boyfriend.

¶ 27        Defendant later woke up in the hospital and had no idea what happened. Defendant testified that when he woke up, the last thing he remembered was listening to the song

"Dance with the Devil." Defendant stated, "None of the lyrics had an impact on me, just the fact that I remember playing it." Defendant admitted some of the lyrics in the song were violent.

¶ 28 Defendant acknowledged he told Detective McMasters during his January 19 video-recorded police interrogation that he was guilty "[b]ut in that interrogation with what was going on, it was a really intense situation to be in and everything in my mind was just exaggerated to the 90,000th degree like you cannot imagine." Defendant experienced blackouts brought on by alcohol consumption on multiple prior occasions. Eventually, the details of the alcohol induced blackout came back to him a few days later. Defendant testified "Hank" is his alter ego. Defendant also acknowledged he told police, during his interrogation, that "Hank" is his alter ego who comes out when he has had too much to drink.

¶ 29 Defendant testified that a few weeks before the January 18 incident, on December 31, 2015, an incident occurred at Maxey's residence. On New Year's Eve, police arrested defendant after he broke a window at Maxey's apartment. Defendant testified that around 11:30 p.m. on December 31, 2015, he received a text message from an ex-girlfriend and Maxey got angry. Defendant acknowledged he was drunk and went outside to smoke a cigarette. After being outside for about 20 minutes, defendant tried to go back inside but Maxey had locked the door. Defendant asked her to let him in and she said no. Maxey refused to give defendant his wallet and telephone. Defendant testified, "she giving me the finger like this through the window, both fingers, fuck you, walk, freeze to death, I don't give a shit." In response, respondent "thumped" on the front window, breaking it. Officer Bertoni subsequently arrested him. Defendant acknowledged he discussed the December 31 incident with police during his January 19 police interrogation. Defendant also testified "Hank" was involved in the window-breaking incident.

¶ 30                                    2. *Scott Snider*

¶ 31          Scott Snider, a dispatcher for the Sangamon County Central Dispatch System, testified that on January 18, 2016, a little after 9 p.m., he received a 911 telephone call. Snider heard both a female and a male voice on the telephone call but did not know who made the telephone call. Snider testified, "Uhm, the female was in distress. It sounded like a male was, uhm, angry." The parties stipulated that Maxey's telephone records showed she made a telephone call to 911 at 9:07 p.m. on January 18, 2016.

¶ 32          The State moved to admit the 911 recording through Snider. The jury then received a transcribed copy of the 911 call in order to follow along with the recorded telephone call. Defense counsel objected to the transcript but not the 911 recording. Subsequently, the State played the recorded 911 telephone call for the jury.

¶ 33          During the 911 telephone call, a female voice can be heard repeatedly screaming "help me," "I'm dying," "I'm bleeding," "You're killing me," "I can't move," and "Let me go." The female also stated, "He stabbed me." During the telephone call, a slapping noise is heard numerous times.

¶ 34          A male's voice can be heard saying "what do you want" and "hell with it, I trusted you." Later into the audio of the 911 telephone call, the same male's voice said, "I did it, I did it all, It's all me. I tried to kill every fuckin person, every fucking soul in this fucking house." The male voice also stated, "give me the knife."

¶ 35                                    3. *Officer Eric Bertoni*

¶ 36          Officer Bertoni testified that on January 18, 2016, he received a dispatch around 9 p.m. to an apartment at 14745 Cotton Hill Road in Pawnee. When Officer Bertoni entered the apartment, he observed "a male and a female laying on the floor covered in blood." Officer

Bertoni observed the apartment in disarray, and it appeared there had been a physical struggle. Officer Bertoni asked defendant his name, but defendant would not respond. Officer Bertoni did not observe any injuries on defendant. Eventually, Maxey informed Officer Bertoni of defendant's name. Officer Bertoni testified Maxey also said that "she was in pain and hurt." Officer Bertoni identified defendant in court as the male he previously saw lying on the floor in the apartment.

¶ 37    Once medical personnel arrived, Officer Bertoni directed defendant to move so medical personnel could help Maxey. Officer Bertoni testified defendant was not cooperative and would not tell him if he was hurt. Officer Bertoni informed defendant if he did not move, he would tase him. When defendant did not respond, Officer Bertoni tased defendant. Defendant failed to comply with medical personnel or Officer Bertoni until Officer Bertoni tased him for a second time. Medical personnel then placed defendant on a gurney and transported him to St. John's Hospital. Officer Bertoni testified defendant was "highly intoxicated."

¶ 38    Officer Bertoni testified William Walsh informed him of the presence of a knife. Officer Bertoni then went back into the apartment and collected the knife. At trial, without objection, the trial court admitted the knife into evidence.

¶ 39    Following defendant's transport to St. John's Hospital, Officer Bertoni went to defendant's room at St. John's Hospital where defendant was sleeping. Around 4 a.m., defendant woke up and asked Officer Bertoni what happened. Officer Bertoni read defendant his *Miranda* rights then informed defendant that defendant "had stabbed [Maxey]." Officer Bertoni testified defendant "advised that it wasn't him, it was Hank." Specifically, "[defendant] said Hank comes out when he's been drinking." Defendant then fell back asleep. Officer Bertoni received a telephone call and stepped out of defendant's room. When Officer Bertoni stepped

back into the room, defendant asked him what happened. Officer Bertoni told defendant Maxey passed away. Defendant then attempted to choke himself. Once medical staff discharged defendant, Officer Bertoni transported defendant to the Sangamon County jail.

¶ 40                                   4. *Detective Mike McMasters*

¶ 41            Detective McMasters testified that on January 19, 2016, around 12:26 p.m., he and Chief Jan Bowsher interviewed defendant at the Sangamon County Sheriff's Department regarding the incident that occurred the day before. Before Detective McMasters interviewed defendant, he advised defendant of his *Miranda* rights. Defendant acknowledged his rights and agreed to speak with police.

¶ 42            When asked if defendant admitted to stabbing Maxey, Detective McMasters testified that during the interview defendant "said he did it several times. Couldn't remember what he did, but he admitted doing it." Defendant told Detective McMasters he had no recollection of the day beyond playing the song "Dance with the Devil." Over objection, Detective McMasters testified the song contained themes related to violence against women. Specifically, Detective McMasters stated, "The one line that stands out to me is it takes a real thug to stab someone until they die while looking them in the eyes." Detective McMasters testified defendant referenced the devil several times and the last line of the song mentions the devil. Detective McMasters also testified defendant mentioned "Hank" and "referenced that is an alter ego of his when, one, he gets weak. Two, the devil controls him, Hank comes out and he says [defendant] goes by [*sic*]."

¶ 43            The State moved to admit a recording of defendant's January 19 police interrogation through Detective McMasters. Over objection, the trial court admitted the recording. The jury then received a transcribed copy of defendant's police interrogation in order

- 12 -

to follow along with the recorded interrogation. Defense counsel objected to the transcript as a whole but not the actual contents. The State played defendant's January 19 police interrogation for the jury.

¶ 44 During the January 19 police interrogation, defendant stated numerous times he did not remember what happened during the incident that resulted in Maxey's death. When defendant woke up in the hospital, he asked Officer Bertoni what happened. Officer Bertoni told him that he stabbed Maxey. Defendant stated, "I did it," "It had to be me," and "Because that's what [Officer Bertoni] told me." Defendant told police his last memory before he woke up in the hospital was listening to the song "Dance with the Devil."

¶ 45 Defendant told police that on the afternoon of January 18, 2016, he and Maxey drank heavily and listened to music. Defendant played the song "Dance with the Devil" and then he and Maxey talked about religion, the devil, and defendant's weakness with alcohol. Defendant described the song "Dance with the Devil" as "evil," "horrible," and "sad." Defendant stated "there's no real relevance to the song" but it was "the last memory that I have of any of this." However, during the interrogation defendant told police that "Satan, the devil, the dark side" took control of him the night of the stabbing. Further, when police asked defendant what triggered the stabbing, he responded, "the song, the weakness, the—the 52 hours of not sleeping and detoxing and then drinking an entire bottle of whiskey and… I don't know man, I—I can't even, I was pure evil, it was pure hatred and I'm gonna fry for it but, it wasn't her fault, whatever it was, it wasn't her fault, it was mine." Defendant described himself as a "puppet" the night of the stabbing where "the devil" or "Hank" pulled his strings that night.

¶ 46 Defendant told police, "I think I went crazy, I think that song and the—and Hank said go ahead and I—and I went bye-bye and Hank went crazy." Defendant explained "Hank"

was his nickname and alter ego. Hank is a "really drunk guy" who can "stay awake and party for three more hours." Defendant told police he "blacked out." Defendant claimed he regularly experienced blackouts after drinking alcohol.

¶ 47          Defendant mentioned that a few weeks prior to January 18, 2016, an incident occurred where Maxey was upset with "Hank" and locked him out of her apartment. Defendant pounded on Maxey's apartment door and asked for his cellular telephone so he could leave. When Maxey refused to give defendant his telephone, defendant broke the front window of Maxey's apartment. When defendant asked for an attorney, police terminated the interview.

¶ 48                              5. *Detective Charles Bott*

¶ 49          Charles Bott, a detective and crime scene investigator for the Sangamon County Sheriff's Office, testified that on January 19, 2016, he photographed an apartment at 14745 Cotton Hill Road. Specifically, Detective Bott took pictures of the scene of the stabbing. The trial court admitted several pictures of Maxey's apartment as it appeared after the stabbing incident. The pictures depicted blood on the walls, floor, and on a broken chair.

¶ 50                              6. *Renee Ackman*

¶ 51          Renee Ackman, Maxey's friend and neighbor, testified that on January 18, 2016, around 9 p.m., she heard a "horrific pounding on [her] door." When Ackman answered the door, she observed a panicked Maxey standing there with a little cut on her head. Maxey screamed, "Lani, please go save my baby." Ackman testified she went by Lani.

¶ 52          After Maxey pleaded for help, Ackman told her daughter to call 911 because "[t]here had been another altercation a couple weeks prior[.]" Ackman then ran over to Maxey's apartment. Ackman testified she entered Maxey's apartment and "saw a lot of blood. [Maxey] and [defendant] laying between the kitchen and the living room and [Maxey's son] in the

kitchen. And I just wanted to get [Maxey's son] out." Ackman testified, "I did see a knife at that point. I wasn't sure, you know, and I took the baby back to my apartment." Although Ackman observed a knife, she did not know who had possession of it.

¶ 53                    7. *William Walsh*

¶ 54        William Walsh, Maxey's neighbor, testified that on January 18, 2016, around 9 p.m., he heard "yelling and screaming." Walsh went outside and observed Ackman running from Maxey's apartment with Maxey's son. Walsh went to Maxey's apartment, walked inside the door, and saw Maxey lying on the floor. Walsh also observed defendant lying on the floor next to Maxey. Walsh testified, "There was just a lot of blood and there was a knife." Walsh observed defendant "laying on his back, but he was reaching toward the knife while on his back." Walsh testified he later told police that he heard defendant say, "let me finish it." Walsh also testified Maxey said, "I don't want to die, please don't let me die, don't let him hurt my baby."

¶ 55        After Walsh observed defendant and Maxey on the ground, he "picked up a rag off of the couch and threw it over the knife and moved it away." Defendant did not prevent Walsh from moving the knife. Walsh testified that when the police arrived, defendant seemed agitated and upset with the police officers.

¶ 56                    8. *Medical Personnel*

¶ 57        Several medical personnel, including Elmer Neal, John Archer, and David Detmers, responded to Maxey's apartment on January 18, 2016. Once on scene, both Archer and Neal observed defendant refuse to cooperate with Officer Bertoni's commands and become very combative with the police officers. Neal testified he assessed defendant for injuries because "he was covered pretty much head to toe in blood." Neal found no injuries on defendant so he

- 15 -

diverted his attention to Maxey. Neal also observed Maxey covered in blood and noted she had a puncture wound to the left forearm. Neal testified "the only thing I heard come out of her mouth was that she had been stabbed multiple times and punched." Detmers testified defendant admitted to drinking and he smelled of alcohol. Detmers also testified defendant was "belligerent and combative."

¶ 58                                  9. *Nathaniel Patterson*

¶ 59            Nathaniel Patterson, an autopsy pathologist, performed the autopsy on Maxey. Patterson certified Maxey's cause of death "as sharp force injuries of the left arm and chest and blunt force injuries of the head." Patterson opined the knife recovered from Maxey's apartment was consistent with the injury to her chest. Patterson did not have the opportunity to examine Maxey's arm injury because emergency personnel made additional incisions to reduce the swelling to save her arm. Patterson was unable to determine what caused Maxey's blunt force injuries.

¶ 60                                  10. *Keith Underwood*

¶ 61            Keith Underwood testified that in 2009, Maxey, his fiancée at the time, accidentally stabbed him in his upper left shoulder. After a party where Underwood and Maxey consumed alcohol, Maxey bumped into a bookcase and a printer started to fall, and in response Underwood shoved Maxey out of the way. Maxey had a kitchen knife in her hand and subsequently stabbed Underwood. Underwood testified Maxey was surprised when he pushed her and based on her reaction, he understood her to be defending herself.

¶ 62                                  11. *Dorothy Brinson*

¶ 63            Over objection, the court allowed the State to call Dorothy Brinson as a rebuttal witness where she expressed a different recollection than defendant of the events that led to the

December 31, 2015, window-breaking incident. Brinson, a college classmate of Maxey, testified that on December 31, 2015, Maxey picked her up with defendant and Maxey's son in the vehicle. Brinson testified defendant was drunk. While in the vehicle, defendant wanted Maxey to "come on to him" but Maxey said no.

¶ 64 Once they arrived at Maxey's apartment, Brinson, Maxey, and Maxey's son went inside the apartment where Maxey locked the door. Defendant eventually pounded on the door and demanded his telephone. Maxey told him "when he calmed down that she would give him his [tele]phone back." According to Brinson, defendant became angry and broke Maxey's apartment window.

¶ 65                                12. *Jury Instructions*

¶ 66 Over objection, the trial court instructed the jury, in relevant part, the believability of a witness could be challenged if he made a statement that was inconsistent with his trial testimony. Further, the jury could consider a witness's earlier inconsistent statement as substantive evidence where the witness acknowledged under oath that he made the statement. The court also instructed the jury on self-defense and the lesser offense of second degree murder.

¶ 67                                13. *Jury Verdict*

¶ 68 The jury found defendant guilty of first degree murder.

¶ 69                    C. Defendant's Posttrial Motions and Sentencing Hearing

¶ 70 On November 29, 2018, defendant filed a motion for a new trial, alleging the trial court erred when it (1) denied defendant's motion *in limine* to exclude or redact the contents of defendant's police interrogation video recording; (2) admitted into evidence a video recording of defendant's police interrogation that occurred after defendant asserted his right to cease the questioning, which was not scrupulously honored; (3) denied defendant's motion *in limine* as to

the specific content of the song lyrics of "Dance with the Devil" that were neither relevant nor probative, and the prejudicial effect outweighed the same, even if, *arguendo*, admissible; (4) allowed other-crimes evidence to be entered into evidence against defendant, specifically, a previous conviction for criminal damage to property; (5) allowed the State to call a previously undisclosed rebuttal witness to testify to the above-referenced irrelevant and non-probative other-crimes evidence; and (6) "allowed *** Illinois Pattern Jury Instruction 3.11 to be tendered to the jury with bracketed material relating to the admission of prior inconsistent statements as substantive evidence, when no such statements were properly admitted at all." In his posttrial motion, defendant also alleged the State failed to prove each and every element of the offense charged beyond a reasonable doubt.

¶ 71        On February 6, 2019, the trial court denied defendant's motion for a new trial and held a sentencing hearing. The court heard evidence in aggravation and mitigation. In aggravation, the State submitted three victim impact statements. In mitigation, defendant's family members wrote letters on defendant's behalf and four witnesses testified in support of defendant. Lee Grabner, Andrew Furlong, Doctor Casey Younkin, and Joe Rupnik all testified to their involvement in the Sangamon County jail Alcoholics Anonymous (AA) program. The witnesses testified defendant regularly attended AA meetings while in jail, became a leader within the meetings, and showed genuine remorse for his actions. Defendant made a statement in allocution where he stated, "I realize that, you know, I committed a horrible act. I caused this woman's death. And I fully accept responsibility for that, but I'll never be that same person again."

¶ 72        The court considered the evidence received at trial, the presentence investigation (PSI) reports, the evidence in aggravation and mitigation, and the need for deterrence. The court

rejected the notion defendant accepted responsibility for his actions that night where defendant "blamed the victim in this case from the start." Specifically, the court stated,

"[S]omehow you've convinced these same people that you're remorseful for this when you take the stand after having a blackout, not being able to remember everything, but then take this stand under oath and blame the innocent victim shows me a lack of remorse. It shows me a lack of true rehabilitative potential. And if there is any remorse, it's not necessarily a lack of remorse, but if there's remorse, it's because you're sitting here right now. I heard words like BS'ing. And I made a note of BS'ing, when someone said BS'ing, that was duly noted by this [c]ourt, and it absolutely applied to you and everything you tried to do during this trial. I heard responsible, I heard remorseful, I heard acceptance of responsibility. And all I can figure is those people who said all that about you were not here to watch this trial, hear your testimony and compare all of that to the ultimate facts of this case. Because anybody that heard that has to be convinced that you're not remorseful other than that you're caught in looking at several years of your life in prison, that you truly didn't accept any responsibility whatsoever. In fact, you blamed the victim instead. And all of that leads this [c]ourt to believe that you don't have much rehabilitative potential, that these are circumstances that will likely reoccur as evidenced on some criminal history involving

damaging property, involving losing your temper, involving acting

out in rage, whether that's to another person or whether that's to

someone's property, it's still indicative of what's going on in your

mind.

So, I've spoken to the factors in aggravation and the

minimal factors in mitigation, considered any potential for

substance abuse treatment, which this defendant will certainly need

to continue in the Illinois Department of Corrections if he is at all

to reform himself should he ever be released from custody. I've

considered the arguments as to sentencing alternatives, and I've

considered the [d]efendant's statement in allocution. I've

considered the totality of everything this [c]ourt is to consider."

Ultimately, the court sentenced defendant to 45 years in prison.

¶ 73       This appeal followed.

¶ 74                                II. ANALYSIS

¶ 75       On appeal, defendant argues (1) the State failed to prove him guilty beyond a

reasonable doubt; (2) the trial court abused its discretion when it admitted prejudicial

other-crimes evidence and improper rebuttal testimony; (3) the court erred when it denied

defendant's motion to suppress, and admitted into evidence at trial, a recording of defendant's

police interrogation where police failed to scrupulously honor defendant's right to remain silent

and, in the alternative, the court should have redacted portions of defendant's recorded

interrogation where defendant made statements that represented the opinion of a police officer;

(4) the court abused its discretion when it admitted testimony as to the lyrics and contents of the

song "Dance with the Devil"; and (5) the court abused its discretion in sentencing defendant to 45 years in prison where the court failed to consider the uncontradicted evidence of defendant's rehabilitative potential. We review each issue in turn.

¶ 76                              A. Sufficiency of the Evidence

¶ 77        Defendant argues the State failed to disprove his claim of self-defense and therefore failed to prove him guilty of first degree murder beyond a reasonable doubt. In the alternative, defendant argues his conviction should be reduced to second degree murder. Further, in the alternative, defendant argues ineffective assistance of trial counsel where his counsel failed to introduce evidence of Maxey's violent character. The State disagrees and argues the jury properly found defendant guilty of first degree murder beyond a reasonable doubt. Further, the State asserts defendant's trial counsel provided effective assistance of counsel.

¶ 78        When considering the sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements of the crime beyond a reasonable doubt. *People v. Bradford*, 2016 IL 118674, ¶ 12, 50 N.E.3d 1112. "It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* "Accordingly, a reviewing court will not substitute its judgment for the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67, 23 N.E.3d 325.

¶ 79                                    1. *Self-Defense*

- 21 -

¶ 80  Defendant argues the State failed to prove he was not acting in self-defense when he stabbed Maxey with a knife. Defendant testified he stabbed Maxey only after she tried to prevent him from leaving the apartment by using physical force where she grabbed a knife and attacked him. In response, defendant grabbed Maxey's arm, took control of the knife, and during this altercation Maxey sustained her injuries.

¶ 81  "Self-defense is an affirmative defense, and once it is raised, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Gray*, 2017 IL 120958, ¶ 50, 91 N.E.3d 876. "Self-defense includes the following elements: (1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of force applied, and (6) the beliefs of the person threatened were objectively reasonable." *Id.* "If the State negates any one of these elements, the defendant's claim of self-defense necessarily fails." *Id.*

¶ 82  "In deciding a claim of self-defense, it is the function of the jury to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence." *Id.* ¶ 51. "It is also incumbent on the jury to resolve conflicts or inconsistencies in the evidence." *Id.* "The standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense." *Id.*

¶ 83  At trial, defendant testified Maxey became upset, punched him in the face, and repeatedly hit him when he did not want to have sex. In response, defendant pushed Maxey and grabbed her cellular telephone to call the police. Maxey then grabbed him around the neck and

they fell backward smashing a chair. Maxey eventually grabbed her cellular telephone and left the apartment.

¶ 84    Defendant went to collect his belongings and leave the apartment when Maxey returned to the apartment. Defendant observed Maxey holding a steak knife in her hand and she moved toward him. In response, defendant grabbed her wrist and the two struggled with the knife as they fell to the ground. When they fell to the ground, Maxey was stabbed with the knife. Defendant also testified that during the struggle, he recalled Maxey previously telling him she stabbed her ex-boyfriend.

¶ 85    However, in his January 19, 2016, police interrogation, the day after the stabbing, defendant told police he did not remember the incident that resulted in Maxey being stabbed. Rather, the last thing defendant remembered was listening to a song earlier in the day. Defendant also informed police when he drinks a lot "Hank" comes out and he loses control. Defendant believed he "went bye-bye and Hank went crazy."

¶ 86    Further, Snider testified he received a telephone call at the same time Maxey's cellular telephone placed a 911 call. Snider heard a woman scream for help and state, "He stabbed me." Snider also heard a male voice say, "I tried to kill every fuckin person, every fucking soul in this fucking house." Ackman testified Maxey pounded on Ackman's door asking for help and telling Ackman to save her baby. Walsh testified he heard defendant say, "let me finish it." Walsh testified he heard Maxey say, "I don't want to die, please don't let me die, don't let him hurt my baby." Neal also testified Maxey said she "had been stabbed multiple times and punched."

¶ 87    Here, when viewing the evidence in the light most favorable to the State, we conclude more than sufficient evidence existed to allow the jury to find defendant guilty beyond

a reasonable doubt. Specifically, the State's evidence proved defendant guilty and negated his self-defense claim. The guilty verdict demonstrates that the jury rejected defendant's version of the events and his self-defense claim. When considering the extensive witness testimony, the state of the crime scene, the condition in which Maxey and defendant were found, defendant's statements and conduct following the attack, and defendant's fluctuating story, the jury clearly determined the State negated defendant's self-defense claim and found defendant completely incredible. Undoubtedly, top-of-mind for the jury was the fact defendant described being subjected to a violent assault by Maxey, but initially he displayed no injuries consistent with the claimed attack. Under these circumstances, the jury was in the best position to assess the credibility of defendant and resolve any conflicts or inconsistencies in the evidence. Accordingly, we find the jury, acting as a rational trier of fact, properly found defendant guilty of first degree murder beyond a reasonable doubt where defendant was not acting in self-defense when he stabbed Maxey with a knife.

¶ 88                                  2. *Second Degree Murder*

¶ 89         In the alternative, defendant argues his conviction should be reduced to second degree murder because his actions were based on a sudden and intense provocation during mutual argument and he subjectively, though unreasonably, believed he needed to defend himself. We decline to reduce defendant's conviction to second degree murder.

¶ 90         A person is guilty of second degree murder when he commits the offense of first degree murder and at the time of killing (1) he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or (2) he believes the circumstances justify using self-defense, but his belief is unreasonable. *People v. Blackwell*, 171 Ill. 2d 338,

- 24 -

357, 665 N.E.2d 782, 790 (1996). A defendant must prove one of the two mitigating factors by a preponderance of the evidence to reduce the offense to second degree murder. *Id.*

¶ 91 Defendant's claim that his actions were based on a sudden and intense provocation during mutual combat fails. "Mutual combat" requires both parties to enter the fight willingly. *People v. Delgado*, 282 Ill. App. 3d 851, 857, 668 N.E.2d 173, 177-78 (1996). Here, defendant claimed he reacted to Maxey in self-defense when she attacked him and came at him with a knife. Based on defendant's own testimony, he did not willingly enter into the fight but instead reacted when Maxey came at him. Thus, any mutual combat or serious provocation claim fails.

¶ 92 Also, where the jury rejected defendant's self-defense claim, that same assessment led the jury to deny defendant a second degree murder conviction. Here, defendant failed to prove by a preponderance of the evidence his alleged unreasonable belief. While defendant testified Maxey attacked him and was accidently stabbed when they fell, the State provided credible contradictory evidence through the 911 telephone call as well as the testimony of multiple witnesses. Frankly, the jury was not required to believe defendant's story that Maxey was the aggressor or that she provoked defendant. Undoubtedly, the jury accepted the State's version of events and, as was well within their purview, determined the evidence required a first degree murder conviction. As stated above, we find the jury was in the best position to assess the credibility of defendant and resolve any conflicts or inconsistencies in the evidence. Accordingly, where defendant failed to meet his burden as to either of the two mitigating factors, we decline to reduce defendant's conviction to second degree murder.

¶ 93 3. *Ineffective Assistance of Counsel*

¶ 94 Further, in the alternative, defendant argues ineffective assistance of trial counsel where his counsel failed to introduce evidence of Maxey's violent character. Specifically, defendant notes counsel failed to introduce into evidence Maxey's 2003 conviction for domestic battery which arose from an incident with her then-stepfather, Lynn.

¶ 95 We review claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of counsel, a defendant must show (1) the attorney's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Id.*

¶ 96 Both prongs of the *Strickland* test must be satisfied; therefore, a finding of ineffective assistance of counsel is precluded if a defendant fails to satisfy one of the prongs. *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601. "A court may resolve a claim of ineffective assistance of counsel by reaching only the prejudice prong, as a lack of prejudice renders irrelevant the issue of counsel's alleged deficient performance." *People v. Hall*, 194 Ill. 2d 305, 337-38, 743 N.E.2d 521, 540 (2000). Prejudice results when there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceedings would have been different. *People v. Simms*, 192 Ill. 2d 348, 362, 736 N.E.2d 1092, 1106 (2000). Here, defendant is unable to establish prejudice.

¶ 97 We find trial counsel's failure to introduce into evidence Maxey's 2003 conviction for domestic battery did not prejudice defendant. Here, the trial court granted defendant's motions *in limine* to admit evidence of Maxey's violent character, including (1) defendant's knowledge of an incident where Maxey stabbed her ex-boyfriend and (2) Maxey's 2003 conviction for domestic battery against her stepfather.

¶ 98      At trial, counsel introduced the incident where Maxey stabbed her ex-boyfriend to support defendant's claim of self-defense where the circumstances in both instances were similar. We note, when testifying at the September 2018 hearing where defense counsel sought permission to introduce the 2003 conviction, Lynn recalled little about the incident, including whether or not he had been drinking. Lynn did however admit to occasionally drinking alcohol to excess. Moreover, Lynn seemed hesitant to criticize Maxey, indicating Maxey hit him "just that one time" and opining that he may have provoked Maxey because "maybe I ran my mouth a little too long." Ultimately, Maxey's remote conviction added little to the question of whether defendant acted in self-defense or whether Maxey was the aggressor. We find there is no reasonable probability that the results of the proceedings would have been different had counsel introduced Maxey's 2003 conviction. Therefore, defendant's ineffective assistance of counsel claim fails.

¶ 99                    B. Other-Crimes Evidence

¶ 100      Defendant next argues the trial court abused its discretion when it permitted the State to introduce prejudicial other-crimes evidence. Specifically, the court admitted evidence of a prior incident where defendant broke the front window of Maxey's apartment. Further, defendant argues the court compounded this error by allowing the State to present evidence of the window-breaking incident through rebuttal testimony, the cumulative effect of which denied defendant a fair trial. The State argues the court did not abuse its discretion in admitting the evidence. We agree with the State.

¶ 101                          1. *Relevance*

¶ 102      "Evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crime." *People v. Pikes*, 2013 IL 115171, ¶ 11,

998 N.E.2d 1247. "Other-crimes evidence is admissible to show *modus operandi*, intent, motive, identity, or absence of mistake with respect to the crime which the defendant is charged." *Id.* Other-crimes evidence is also properly admitted to show the defendant's state of mind. *People v. Wilson*, 257 Ill. App. 3d 826, 830-31, 629 N.E.2d 582, 585 (1994). "However, even where relevant, the evidence should not be admitted if its probative value is substantially outweighed by its prejudicial effect." *Pikes*, 2013 IL 115171, ¶ 11.

¶ 103        When we consider prejudicial effect, we examine whether the evidence in question will cause the jury to view defendant in an unflattering light based on reasons totally detached from the matter on trial. *People v. Lynn*, 388 Ill. App. 3d 272, 278, 904 N.E.2d 897, 992 (2009). Importantly, the jury should not decide the case based on sympathy, hatred, contempt, or horror. *People v. Lewis*, 165 Ill. 2d 305, 329, 651 N.E.2d 72, 83 (1985).

¶ 104        "The admissibility of evidence rests within the discretion of the trial court, and its decision will not be disturbed absent an abuse of discretion." *Pikes*, 2013 IL 115171, ¶ 12. "A reviewing court, however, may not simply substitute its judgment for that of the trial court on a matter within the trial court's discretion." *People v. Illgen*, 145 Ill. 2d 353, 371, 583 N.E.2d 515, 522 (1991).

¶ 105        Based on the record, we find the trial court did not abuse its discretion when it admitted the other-crimes evidence where the window-breaking incident was relevant and probative of defendant's state of mind at the time he stabbed Maxey and any prejudicial effect failed to substantially outweigh its probative value.

¶ 106        Prior to trial, defendant filed a motion *in limine* to exclude evidence of the December 31, 2015, incident where defendant broke the front window of Maxey's apartment. The trial court denied defendant's motion, finding the incident "highly relevant" where

defendant "in his own words referred to the particular conduct and compared it to the events of this fateful evening."

¶ 107    During his January 19, 2016, police interrogation, defendant told police his theory. He suggested, "I think I went crazy, I think that song and the—and Hank said go ahead and I—and I went bye-bye and Hank went crazy." Defendant described himself as a "puppet" the night of the stabbing where "the devil" or "Hank" pulled his strings. Defendant explained "Hank" was his nickname and alter ego. Hank is a "really drunk guy" who can "stay awake and party for three more hours." Defendant indicated he regularly experienced blackouts after drinking alcohol.

¶ 108    Further, defendant told police that a few weeks prior to January 18, 2016, an incident occurred where Maxey was upset with "Hank" and locked him out of her apartment. Defendant pounded on Maxey's apartment door and asked for his cellular telephone so he could leave. When Maxey refused to give defendant his telephone, defendant broke the front window of Maxey's apartment.

¶ 109    At trial, defendant also testified to the December 31, 2015, incident. On New Year's Eve, police arrested defendant after he broke a window at Maxey's apartment. Defendant testified that around 11:30 p.m. on December 31, he received a text message from an ex-girlfriend and Maxey got angry. Defendant acknowledged he was drunk and went outside to smoke a cigarette. After being outside for about 20 minutes, defendant tried to go back inside, but Maxey had locked the door. Defendant asked her to let him in, and she said no. Maxey refused to give defendant his wallet and telephone. Defendant testified, "she giving me the finger like this through the window, both fingers, fuck you, walk, freeze to death, I don't give a shit." In response, respondent "thumped" on the front window, breaking it. Officer Bertoni

subsequently arrested him. Defendant also acknowledged he discussed the December 31 incident with police during his January 19 police interrogation. Defendant testified "Hank" was involved in the window-breaking incident.

¶ 110　　　　Ackman also testified that on the night of January 18, 2016, after Maxey pounded on her front door and screamed for help, before Ackman ran over to Maxey's apartment, she told her daughter to call 911 because "[t]here had been another altercation a couple weeks prior[.]"

¶ 111　　　　We find the court properly admitted evidence of the window-breaking incident where defendant referenced the incident during his police interrogation the day after the stabbing. Defendant also testified at trial about the prior window-breaking incident. The window-breaking incident and the circumstances surrounding Maxey's stabbing shared common features. Specifically, in both instances defendant claimed he was highly intoxicated, his alter ego "Hank" committed the act, and both instances involved him and Maxey. We find the prior incident was relevant where it showed defendant's state of mind when he stabbed Maxey and the nature of Maxey and defendant's relationship. Further, we also find the evidence of the window-breaking incident to be probative of defendant's state of mind where it occurred a few weeks before the January 18 stabbing of Maxey.

¶ 112　　　　Finally, where the incident failed to demonstrate severe violence akin to the conduct testified to have occurred when Maxey was murdered, any prejudicial effect failed to substantially outweigh the evidence's probative value.

¶ 113　　　　　　　　　　　　　　　2. *Rebuttal Testimony*

¶ 114　　　　Defendant argues the court abused its discretion when it allowed the State to present evidence of the window-breaking incident through rebuttal testimony. Specifically, Brinson's recollection of the window-breaking incident was not sufficiently different from

- 30 -

defendant's testimony to be admissible as rebuttal testimony. Defendant also argues he did not open the door to Brinson's rebuttal testimony but rather the State introduced the window-breaking incident through his police interrogation and Ackman's testimony. The State argues the court properly admitted Brinson's rebuttal testimony. We note the State in its brief appears to address the difference between Brinson's recollection of the window-breaking incident and defendant's recollection of the window-breaking incident but attributes the rebuttal testimony to Ackman. In his reply brief, defendant offers no clarification on the discrepancy. We proceed and consider the rebuttal evidence regarding the window-breaking incident testified to by Brinson.

¶ 115    "Rebuttal evidence is presented by the State to explain, repel, contradict, or disprove evidence presented by the defendant." *People v. Mischke*, 278 Ill. App. 3d 252, 264, 662 N.E.2d 442, 450-51 (1995). Rebuttal testimony is allowed when it is relevant to the question of defendant's believability. *Id.* "The decision to admit rebuttal testimony will not be reversed absent an abuse of discretion by the trial court." *People v. Eveans*, 277 Ill. App. 3d 36, 47, 660 N.E.2d 240, 248 (1996).

¶ 116    Here, defendant referenced the prior window-breaking incident during his January 19, 2016, police interrogation. Then, at trial, defendant went into greater detail about the window-breaking incident as noted above. By testifying to the specifics of the incident, defendant put his credibility at issue, allowing the State to present evidence that would contradict defendant's testimony.

¶ 117    On the final day of trial, the State moved to present testimony from rebuttal witness Brinson. During the proffer, Brinson testified to the events of the December 31, 2015, window-breaking incident. Over objection, the court allowed the State to call Brinson as a

rebuttal witness where she expressed a different recollection than defendant of the events that led to the December 31, 2015, window-breaking incident.

¶ 118 Brinson testified that on December 31, 2015, Maxey picked her up with defendant and Maxey's son in the vehicle. Brinson testified defendant was drunk. While in the vehicle, defendant wanted Maxey to "come on to him," but Maxey said no.

¶ 119 Once they arrived at Maxey's apartment, Brinson, Maxey, and her son went inside the apartment and locked the door. Defendant eventually pounded on the door and demanded his telephone back. Maxey told him "when he calmed down that she would give him his [tele]phone back." Brinson testified defendant was angry. He then broke Maxey's apartment window.

¶ 120 Based on the evidence, we find the trial court did not abuse its discretion when it allowed the State to present rebuttal testimony where defendant's credibility was at issue in this case and defendant's and Brinson's recollection of the incident differed. Because the court did not err in admitting evidence of the window-breaking incident or allowing rebuttal testimony, we decline to address any cumulative error claim.

¶ 121 C. Motion to Suppress Defendant's Recorded Police Interrogation

¶ 122 Defendant next argues the trial court erred when it denied defendant's motion to suppress, and admitted into evidence at trial, a recording of defendant's police interrogation where police failed to scrupulously honor defendant's right to remain silent. In the alternative, defendant argues the court abused its discretion when it failed to redact portions of defendant's recorded interrogation where defendant made statements that represented the opinion of Officer Bertoni. The State argues the court properly denied defendant's motion to suppress and correctly admitted defendant's recorded police interrogation. We agree with the State.

¶ 123                                    1. *Right to Remain Silent*

¶ 124          Defendant argues the trial court erred when it denied defendant's motion to

suppress and admitted into evidence at trial a recording of defendant's police interrogation where

police failed to scrupulously honor defendant's right to remain silent.

¶ 125          When reviewing a trial court's suppression ruling, the reviewing court applies a

two-part standard of review. *People v. Oliver*, 236 Ill. 2d 448, 454, 925 N.E.2d 1107, 1110

(2010). A trial court's factual findings are entitled to great deference, and a reviewing court will

reverse them only if they are against the manifest weight of the evidence. *Id.* The trial court's

ultimate legal ruling is reviewed *de novo*. *Id.*

¶ 126          "A statement made by a suspect as a result of a custodial interrogation is

admissible if, after being advised of his *Miranda* rights, including the right to remain silent, he

voluntarily waives his rights prior to making the statement." *People v. R.C.*, 108 Ill. 2d 349, 353,

483 N.E.2d 1241, 1243 (1985) (citing *Miranda*, 384 U.S. at 444-45). Even if a suspect initially

waives his rights and agrees to talk to police, the interrogation must cease if he indicates he

wishes to remain silent. *Id.* "Under these circumstances, the interrogation may be resumed and

any statement resulting from renewed questioning is admissible only if the suspect's right to

remain silent was 'scrupulously honored.' " *Id.* (quoting *Michigan v. Mosley*, 423 U.S. 96,

103-04 (1975)).

¶ 127          In deciding whether a suspect's right to remain silent was scrupulously honored,

"courts should consider whether (1) the police immediately halted the initial interrogation after

the defendant invoked his right to remain silent; (2) a significant amount of time elapsed between

the interrogations; (3) a fresh set of *Miranda* warnings were given prior to the second

interrogation; and (4) the second interrogation addressed a crime that was not the subject of the

first interrogation." *People v. Nielson*, 187 Ill. 2d 271, 287, 718 N.E.2d 131, 142 (1999) (citing *Mosley*, 423 U.S. at 104-05). "The fact that the second interrogation addressed the same crime as the first interrogation does not preclude a finding that the defendant's right to remain silent was scrupulously honored." *Id.*

¶ 128     At the hearing on the motion to suppress, Officer Bertoni testified that on January 19, 2016, around 4:30 a.m., defendant woke up in the hospital and asked him what happened. Before answering, Officer Bertoni read defendant his *Miranda* rights. Defendant agreed to speak with Officer Bertoni and again asked what happened. Officer Bertoni told defendant he stabbed Maxey. Subsequently, defendant "covered his head up and said he didn't want to talk anymore because he was ashamed of what he did." Officer Bertoni testified he ceased questioning defendant.

¶ 129     A while later, Officer Bertoni received a telephone call and stepped out of defendant's hospital room. When Officer Bertoni stepped back into defendant's hospital room, defendant asked him what happened. Officer Bertoni advised defendant that Maxey died. Defendant then started "yelling and trying to choke himself." Once the hospital discharged defendant, Officer Bertoni transported defendant to the Sangamon County Sheriff's Office to be interviewed.

¶ 130     Detective McMasters testified that on January 19, 2016, around 12:30 p.m., he interviewed defendant at the Sangamon County Sheriff's Office. Before questioning defendant, Detective McMasters read defendant his *Miranda* rights. Defendant agreed to speak with Detective McMasters and the interview commenced.

¶ 131     Defendant argues Officer Bertoni continued to question him about the stabbing incident with Maxey after he invoked his right to silence. Thus, his January 19 recorded police

interrogation was not admissible at trial because his right to remain silent was not scrupulously honored.

¶ 132    In ruling on defendant's motion to suppress, the trial court found Officer Bertoni's testimony more credible than defendant's testimony.  Ultimately, the court denied defendant's motion to suppress the recorded police interrogation, findingby a preponderance of the evidence that at the time of the second interview, the police scrupulously honored defendant's right to remain silent.

¶ 133    Based on the evidence, we find the trial court's credibility determinations were not against the manifest weight of the evidence.  Further, the court properly denied defendant's motion to suppress the recorded police interrogation because the police scrupulously honored defendant's right to silence when Officer Bertoni halted the initial interrogation after defendant invoked his right to silence, and a significant period of time elapsed before Detective McMasters provided fresh *Miranda* warnings and interviewed defendant again.  Therefore, the court did not err when it allowed defendant's recorded police interrogation to come in as evidence at trial.

¶ 134                      2. *Unredacted Police Interrogation*

¶ 135    In the alternative, defendant argues the trial court abused its discretion when it failed to redact portions of defendant's recorded police interrogation because defendant made statements that represented the opinion of Officer Bertoni.  Specifically, defendant argues that during his interrogation, he told police he must have stabbed Maxey because that was what Officer Bertoni told him.  Defendant asserts Officer Bertoni's opinion of the events was irrelevant, constituted inadmissible hearsay, and was not based on his personal knowledge.  The State argues the court did not abuse its discretion when it denied defendant's request to redact defendant's statements to police.  We agree with the State.

¶ 136    "Statements made by police officers when questioning a defendant, including opinions and observations regarding the defendant's guilt or credibility, are generally relevant and admissible to demonstrate the statements' effects on the defendant, to provide context to the defendant's responses, or to explain the logic and course of the officer's interview or investigation." *People v. McCallum*, 2019 IL App (5th) 160279, ¶ 56, 144 N.E.3d 491.

¶ 137    During defendant's January 19 police interrogation, defendant stated he did not remember what happened during the incident that resulted in Maxey's death. Rather, when defendant woke up in the hospital, he asked Officer Bertoni what happened, and Officer Bertoni told him that he stabbed Maxey. Defendant told police, "I did it," "It had to be me," and "Because that's what [Officer Bertoni] told me."

¶ 138    Defendant's statements to police that Officer Bertoni told him what happened during the incident that resulted in Maxey's death provided context and assisted the jury in determining the weight to be given to defendant's statements and testimony.

¶ 139    In *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 48, this court stated as follows:

> "In determining whether or which questions or statements by a police officer during an interrogation of the defendant are admissible, a trial court should consider (1) whether the officer's questions or statements would be helpful to the jury so as to place the defendant's responses (or lack thereof) into context and (2) assuming the first criteria is satisfied, whether the prejudicial effect of the officer's questions or statements substantially outweighs their probative value."

Questions and statements by police officers during defendant's interrogation need only be "helpful," not "necessary" to a jury's understanding of the defendant's responses or silence. *Id.*

¶ 140    The defendant in *Whitfield* "concede[d] that statements he made during his videotaped interrogation were relevant and admissible. Without the officers' statements and questions, the meaning and significance of [the] defendant's answers, comments, behaviors—or even, at times, his silence—would be difficult to discern." *Id.* ¶ 49.

¶ 141    We find defendant's statements made by Officer Bertoni as to what happened to Maxey were relevant to give context to defendant's answers, comments, and behaviors during his January 19 police interrogation. Further, Officer Bertoni's statements were not inadmissible hearsay because they were not offered for the truth of the matter asserted. Rather, Officer Bertoni's remarks were offered to show the course of the interview, the effect his remarks had on defendant, and to put defendant's statements to police during his interrogation into context. Moreover, Officer Bertoni's remarks did not amount to inadmissible lay opinion. Officer Bertoni did not testify as to defendant's guilt. Rather, Officer Bertoni's statements to defendant were presented to show the course of the conversation between defendant and the officer.

¶ 142    Finally, where Bertoni's statements served to give necessary context to defendant's conduct and responses and were not offered for the truth of the matters asserted, we are reluctant to find any prejudice, let alone prejudice that substantially outweighed the probative value of the statements. Accordingly, the trial court did not abuse its discretion when it declined to redact portions of defendant's recorded police interrogation.

¶ 143                              D.  "Dance with the Devil"

¶ 144    Defendant next argues the trial court abused its discretion when it allowed irrelevant and prejudicial testimony relating to the lyrics and content of the song "Dance with the Devil." The State argues the court did not abuse its discretion when it admitted the evidence. We agree with the State.

¶ 145    " 'Evidence is relevant when it (1) renders a matter of consequence more or less probable or (2) tends to prove a fact in controversy.' " *People v. Shaw*, 2016 IL App (4th) 150444, ¶ 63, 52 N.E.3d 728 (quoting *People v. Pelo*, 404 Ill. App. 3d 839, 864, 942 N.E.2d 463, 485 (2010)).  " '[R]elevant evidence is inadmissible only if the prejudicial effect of admitting that evidence *substantially outweighs* any probative value.' "  (Emphasis in original.)  *Id.* (quoting *Pelo*, 404 Ill. App. 3d at 867).

¶ 146    Based on the record, we find the trial court did not abuse its discretion when it allowed testimony relating to the lyrics and content of the song.  Defendant made repeated reference to the song throughout his recorded police interrogation and testified to it at trial.  We find the contents and lyrics of the song to be relevant.

¶ 147    Prior to trial, defendant filed a motion *in limine* to exclude the lyrics or any reference to the song "Dance with the Devil."  The trial court denied defendant's motion finding the meaning behind the song was "overwhelmingly relevant to [defendant's] state of mind" and "it is in no way more prejudicial than it is probative."

¶ 148    During his January 19, 2016, police interrogation, defendant told police his last memory before he woke up in the hospital was listening to the song "Dance with the Devil."  On the afternoon of January 18, 2016, defendant and Maxey drank heavily and listened to music.  Defendant played the song "Dance with the Devil" and then he and Maxey talked about religion, the devil, and defendant's weakness with alcohol.  Defendant described the song "Dance with the Devil" as "evil," "horrible," and "sad."  Defendant stated, "there's no real relevance to the song," but it was "the last memory that I have of any of this."

¶ 149    However, during the interrogation defendant also told police "Satan, the devil, the dark side" took control of him the night of the stabbing.  Further, when police asked defendant

what triggered the stabbing, he responded, "the song, the weakness, the—the 52 hours of not sleeping and detoxing and then drinking an entire bottle of whiskey and… I don't know man, I— I can't even, I was pure evil, it was pure hatred and I'm gonna fry for it but, it wasn't her fault, whatever it was, it wasn't her fault, it was mine." Defendant described himself as a "puppet" the night of the stabbing where "the devil" or "Hank" pulled his strings. Ultimately, defendant told police his view of what occurred, stating, "I think I went crazy, I think that song and the—and Hank said go ahead and I—and I went bye-bye and Hank went crazy."

¶ 150        At trial, defendant testified that on January 18, 2016, he played the song "Dance with the Devil" by Immortal Technique on YouTube. While listening to the song, defendant and Maxey discussed the lyrics of the song. Defendant testified the song affected Maxey emotionally and "[s]he got upset."

¶ 151        Defendant testified when he woke up in the hospital the last thing he remembered was listening to the song "Dance with the Devil." Defendant stated, "None of the lyrics had an impact on me, just the fact that I remember playing it." However, defendant admitted some of the lyrics in the song were violent. Defendant also acknowledged that he told police during his interrogation that "Hank" is his alter ego who comes out when he has had too much to drink.

¶ 152        Further, Detective McMasters testified that during defendant's January 19 police interrogation, defendant told the detective he had no recollection of the day after he played the song "Dance with the Devil." Over objection, Detective McMasters testified the song contained themes related to violence against women. Specifically, Detective McMasters stated, "The one line that stands out to me is it takes a real thug to stab someone until they die while looking them in the eyes." Detective McMasters testified defendant referenced the devil several times, and the last line of the song mentions the devil. Detective McMasters also testified defendant mentioned

"Hank" and "referenced that is an alter ego of his when, one, he gets weak. Two, the devil controls him, Hank comes out and he says [defendant] goes by [*sic*]."

¶ 153    We find the court properly admitted testimony related to the content and lyrics of the song "Dance with the Devil." While defendant stated the song had no real relevance, he referenced the song multiple times throughout his police interrogation and at trial. Further, defendant in his police interrogation identified the song as a possible cause of his actions on the night of Maxey's stabbing. Defendant also told police the devil controlled him the night of the stabbing; thus, the song's refence to the devil goes to defendant's state of mind. Therefore, we find the song highly relevant. Moreover, while the evidence did provide insight into what was happening when Maxey died, it was not of such an inflammatory nature that it overtook the issue at hand and somehow led the jury to punish defendant for matters unrelated to the charge being considered. Thus, any prejudicial effect did not substantially outweigh the probative value of the evidence.

¶ 154                        E.  Excessive Sentence

¶ 155    Last, defendant argues the trial court abused its discretion in sentencing defendant to 45 years in prison because the court failed to consider the uncontradicted evidence of defendant's rehabilitative potential. We disagree.

¶ 156    The trial court has discretion in sentencing, and we will not reverse a sentence absent an abuse of discretion. *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656. Such discretion in sentencing is necessary because "the trial court is in a better position to judge the credibility of the witnesses and the weight of the evidence at the sentencing hearing ***." *People v. Ramos*, 353 Ill. App. 3d 133, 137, 817 N.E.2d 1110, 1115 (2004). "A sentence that falls within the statutory range is not an abuse of discretion unless it is manifestly

disproportionate to the nature of the offense." *People v. Franks*, 292 Ill. App. 3d 776, 779, 686 N.E.2d 361, 363 (1997).

¶ 157 "A sentence imposed by the trial court is presumed to be proper." *People v. Butler*, 2013 IL App (1st) 120923, ¶ 31, 994 N.E.2d 89. "There is a strong presumption that the trial court considered any evidence of mitigation presented to it." *Id.* "In order to rebut this presumption, the defendant must present some indication, other than the sentence imposed, that the trial court did not consider the mitigating evidence." *Id.*

¶ 158 Defendant forfeited his claim that his 45-year prison sentence is excessive because he failed to file a motion to reconsider the sentence. See 730 ILCS 5/5-4.5-50(d) (West 2016) ("A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed with the [trial court] clerk within 30 days following the imposition of sentence."). The State argues defendant's forfeited claim should not be analyzed for plain error because it is merely an arguable error. We disagree.

¶ 159 When a defendant fails to file a motion to reconsider his sentence to preserve sentencing issues on appeal, the court's sentencing decision will only be overturned if the defendant demonstrates plain error. *People v. Moreira*, 378 Ill. App. 3d 120, 131, 880 N.E.2d 263, 272 (2007).

¶ 160 Under the plain error doctrine, we first determine whether a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). If the reviewing court determines a clear or obvious error occurred, the second step is to determine whether (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the

judicial process, regardless of the closeness of the evidence." *Id.* Thus, we turn to whether the court abused its discretion by committing a clear or obvious error in sentencing defendant to 45 years in prison.

¶ 161 The trial court errs when the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210, 737 N.E.2d 626, 629 (2000). As the court determines an appropriate sentence, "a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed." *People v. Hernandez*, 319 Ill. App. 3d 520, 529, 745 N.E.2d 673, 681 (2001). "A defendant's potential for rehabilitation is not given greater weight than the seriousness of the crime." *People v. Haley*, 2011 IL App (1st) 093585, ¶ 64, 960 N.E.2d 670.

¶ 162 In determining defendant's sentence, the trial court considered the evidence received at trial, the PSI reports, the defendant's statement in allocution, and the evidence in aggravation and mitigation. In mitigation, defendant's family wrote letters on defendant's behalf and four witnesses testified to defendant's participation in AA while incarcerated and his genuine remorse for his actions. The court in sentencing defendant explicitly addressed defendant's remorse for the crime and his rehabilitative potential as factors to be considered in making its decision.

¶ 163 The court considered the possibility of rehabilitation and found defendant lacked rehabilitative potential because he continued to blame the victim throughout the case. The court stated,

"In fact, you blamed the victim instead. And all of that leads this [c]ourt to believe that you don't have much rehabilitative potential, that these are circumstances that will likely reoccur as evidenced on some criminal history involving damaging property, involving losing your temper, involving acting out in rage, whether that's to another person or whether that's to someone's property, it's still indicative of what's going on in your mind."

¶ 164     We find the trial court did not abuse its discretion when it sentenced defendant to 45 years in prison because the sentence fell within the statutory range and was not disproportionate to the nature of the offense. The trial court at sentencing analyzed defendant's rehabilitative potential in depth and found defendant's conduct demonstrated a lack of rehabilitative potential and likely recidivism that reasonably required imprisonment. Therefore, we cannot say that the court abused its discretion by sentencing defendant to 45 years' imprisonment in this case. Accordingly, defendant fails to demonstrate a clear or obvious error to support his contention of plain error.

¶ 165                              III. CONCLUSION

¶ 166     For the reasons stated, we affirm the trial court's judgment.

¶ 167     Affirmed.